## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | |
|---|---|
| **REBECCA GREEN, Individually and on behalf of herself and other similarly situated employees,**    )<br>)<br>)<br>)<br>**Plaintiff,**    )<br>)<br>)<br>**v.**    )<br>)<br>**MISSION HEALTH COMMUNITIES, LLC, a Florida Limited Liability Company, and DICKSON OPERATOR, LLC, a Florida Limited Liability Company,**   )<br>)<br>)<br>)<br>)<br>)<br>)<br>**Defendants.**    ) | **Case No. 3:20-cv-00439**<br>**Judge Aleta A. Trauger** |

## MEMORANDUM

Plaintiff Rebecca Green has filed a Collective Action Complaint (Doc. No. 1) asserting claims to recover unpaid overtime wages and other damages from defendants Mission Health Communities, LLC ("Mission Health") and Dickson Operator, LLC ("Dickson") (collectively, "defendants") under the Fair Labor Standards Act ("FLSA"). Green brings the case on behalf of herself and other similarly situated Certified Nursing Assistants ("CNAs") who were employed by the defendants during the three years prior to the filing of the Complaint. Now before the court is the Motion to Compel Arbitration, or Alternatively to Dismiss for Failure to State a Claim (Doc. No. 12), filed jointly by the defendants. For the reasons set forth herein, the motion will be granted in part, insofar as it seeks to compel arbitration.

## I.  STATEMENT OF THE CASE

In the Collective Action Complaint, Green alleges that Mission Health is the "parent company" of Dickson and that the defendants together constitute an "integrated enterprise" as that

term is defined by 29 U.S.C. § 203(r), because "their related business activities performed through unified operations of common control were/are for a common business purpose," and that they jointly employed her and other CNAs at the Dickson Health and Rehabilitation Center in Dickson, Tennessee (Doc. No. 1 ¶¶ 8, 10-11.) She alleges that the she and other similarly situated CNAs regularly worked for the defendants in excess of forty hours per week during the three years preceding the filing of the Complaint, that the defendants implemented and maintained a policy of "clocking out" CNAs for an "automatically deducted thirty (30) minute unpaid meal period whether or not" the CNAs were actually relieved from their job duties or continued to perform job duties during such meal times, and that the plaintiff and other similarly situated CNAs were not compensated at the applicable FLSA overtime compensation rates of pay for their automatically deducted thirty minute unpaid meal periods, despite continuing to work during these unpaid meal periods, in violation of the FLSA. (Doc. No. 1 ¶¶ 20–25.)

In response to the filing of the Complaint, the defendants filed a Motion to Compel Arbitration, supporting Memorandum of Law, the Declaration of Juli Greger, and numerous exhibits, including two separate agreements signed by the plaintiff, both of which contain arbitration agreements. (Doc. Nos. 12, 13, 14, 14-1.)

Greger is Mission Health's Senior Human Resources manager and has held that position since 2016. (Doc. No. 14 ¶ 2.) Greger attests that she has personal knowledge of the human resources ("HR") operations for all Mission Health facilities, including Dickson Health and Rehabilitation Center (the "Facility"), and the ability to access the personnel files of employees who worked at the Facility, including Rebecca Green's. (*Id.*) These HR records reflect that Green was hired by Mission Health and began working at the Facility as a CNA on September 11, 2018. (*Id.* ¶ 3.) She voluntarily resigned on September 10, 2019 but returned and was rehired

approximately one month later, on October 16, 2019. (*Id.*) Her employment was terminated on February 24, 2020. (*Id.*)

Greger states that Green's co-employer at all times during her employment by Mission Health at the Facility was Engage PEO ("Engage"), with which Mission Health has entered into a Client Service Agreement. (Doc. No. 14 ¶ 3.) Pursuant to the Client Service Agreement, Mission Health and "related entity" Dickson operate the Facility, while Engage provides HR assistance, payroll services, and workers' compensation administration. (*Id.*)

Greger is familiar with the "normal application and orientation process" that is completed with "any new hire at a Mission Health facility." (*Id.* ¶ 4.) New hires are "required to participate in the orientation process," during which they are provided with a number of documents, including an "Employee Acknowledgment and Agreement," which incorporates an arbitration agreement. (*Id.*) Applicants are informed that signing the Employee Acknowledgment and Agreement is a condition of their employment. If they have questions, applicants are "given the information regarding arbitration and can speak with the Facility's human resources representative." (*Id.*) Green signed an Employee Acknowledgment and Agreement each time she was employed by Mission Health; one is signed and dated September 11, 2018 ("2018 Agreement"); the other is signed and dated October 16, 2019 ("2019 Agreement"). (*Id.* ¶ 5; Doc. No. 14-1, at 2, 4.)

The 2018 Agreement contains logos for both Engage and Mission Health in the header of the document. (Doc. No. 14-1, at 3.) It states, in relevant part:

> I understand that Mission Health has entered into a Client Service Agreement ("Agreement") with ENGAGE PEO . . . , whereby ENGAGE has agreed . . . to become a co-employer of individuals who will perform services for Mission Health. . . .
>
> In consideration of my hiring by ENGAGE, I acknowledge[,] understand and agree that: (i) I am an **AT-WILL** employee and no contract of employment exists between me and Mission Health, or between ENGAGE and me, and ENGAGE has no liability with regard to any employment agreement, now and in the future; (ii)

any employment agreement between me and Mission Health will not be . . . binding on ENGAGE; (iii) either ENGAGE, Mission Health, or I may terminate our co-employment relationship at any time, with or without notice or cause . . . ; and (iv) continued employment with Mission Health is an essential requirement for employment with ENGAGE, and that if my employment with Mission Health ends, my employment with ENGAGE will also immediately end at that time. As further consideration for my hiring by ENGAGE, I agree that I will settle any and all previously unasserted claims, disputes or controversies arising out of or relating to my application/consideration for employment, employment and/or separation from employment, **exclusively** by final and binding **arbitration** before a neutral Arbitrator; this does not preclude use of the EEOC or similar state agency procedure. By way of example only, such claims include claims under federal . . . wage and hour laws . . . .

I understand and agree that all of my compensation for work done for Mission Health must be paid by ENGAGE. . . .

(Doc. No. 14-1, at 3 (emphasis in original).) In the final paragraph of the 2018 Agreement, the plaintiff "acknowledge[d] and agree[d] to abide by the foregoing regarding [her] employment with Mission Health and Engage PEO." (*Id.* at 4.) The plaintiff signed and dated the Agreement just below that paragraph. (*Id.*)

The format and language of the 2019 Agreement differ slightly. The more recent Agreement does not expressly reference Mission Health and, instead, contains a blank where the identity of the "Client" with which Engage has entered into a Client Service Agreement was apparently intended to be written. Also, Mission Health's logo does not appear at the head of the Agreement. Throughout the Agreement, the word "Client" is used instead of "Mission Health." Otherwise, the language is materially indistinguishable from that of the 2018 Agreement, and it likewise contains the plaintiff's signature and date. (Doc. No. 14-1, at 2.)

The defendants argue that the plaintiff is bound by these Agreements to arbitrate her dispute with Mission Health and Dickson. Alternatively, they argue that the Complaint should be dismissed under Rule 12(b)(6), for failure to state a claim for which relief may be granted. In support of this argument, the defendants rely on Greger's Declaration and other exhibits attached

thereto, directly taking issue with allegations in the Complaint and purporting to show that Green was paid overtime and was not subject to automatic thirty-minute meal break deductions from her time. (Doc. Nos. 14, 14-2, 14-3, 14-4.)

The plaintiff filed a Response (Doc. No. 18), arguing that (1) she never agreed to arbitrate her claims against the defendants; and (2) the defendant's 12(b)(6) motion is improper, insofar as it relies on extrinsic evidence and attempts to contest the veracity of the plaintiff's factual allegations. The defendants filed a Reply. (Doc. No. 19.)

## II. THE MOTION TO COMPEL ARBITRATION

### A. Legal Standards

The Federal Arbitration Act ("FAA") allows parties to a "contract evidencing a transaction involving commerce" to agree that certain disputes between them arising from such "contract or transaction" will be decided by an arbitrator rather than by a court. 9 U.S.C. § 2. Described by the Supreme Court as the "primary substantive provision" of the FAA, *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983), Section 2 of the FAA further provides that any such agreement to arbitrate "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. This section embodies "a liberal federal policy favoring arbitration." *AT & T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (quoting *Moses H. Cone*, 460 U.S. at 24). The principal purpose of the FAA is to ensure the enforcement of private arbitration agreements according to their terms; the broader purpose of allowing parties to submit grievances to arbitration is to facilitate "efficient, streamlined procedures tailored to the type of dispute" at issue. *Id.* at 344 (citations omitted); *see also Stout v. J.D. Byrider*, 228 F.3d 709, 714 (6th Cir. 2000) ("The FAA was designed to override judicial reluctance to enforce arbitration agreements, to relieve court congestion, and to provide parties with a speedier and less costly alternative to litigation."). At the same time, it is well established

that arbitration is simply a "matter of contract[,] and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *AT & T Techs. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986); *see also GGNSC Louisville Hillcreek, LLC v. Estate of Bramer*, 932 F.3d 480, 485 (6th Cir. 2019) ("An agreement to arbitrate is fundamentally a matter of consent.").

The FAA provides that a party aggrieved by another party's failure or refusal to arbitrate in accordance with a written arbitration contract may petition the court for an order directing the parties to proceed in arbitration in accordance with the terms of an arbitration agreement. 9 U.S.C. § 4. The court reviewing the petition generally must "determine whether the parties agreed to arbitrate the dispute at issue." *Stout*, 228 F.3d at 714. The Supreme Court has held that "the FAA preempts state law regarding arbitration." *Glazer v. Lehman Bros., Inc.*, 394 F.3d 444, 451 (6th Cir.2005) (citing *Southland Corp. v. Keating*, 465 U.S. 1, 10–11 (1984)). However, state contract law governs issues of formation, such as validity, revocability, and enforceability, with respect to the arbitration clause. *Perry v. Thomas*, 482 U.S. 483, 492 n.9 (1987). "The federal policy favoring arbitration, however, is taken into consideration even in applying ordinary state law." *Walker v. Ryan's Family Steak Houses, Inc.*, 400 F.3d 370, 377 (6th Cir. 2005).

In evaluating motions to compel arbitration, "courts treat the facts as they would in ruling on a summary judgment motion, construing all facts and reasonable inferences that can be drawn therefrom in a light most favorable to the non-moving party." *Jones v. U-Haul Co. of Mass. & Ohio Inc.*, 16 F. Supp. 3d 922, 930 (S.D. Ohio 2014); *see also Great Earth Cos. v. Simon*, 288 F.3d 878, 889 (6th Cir. 2002) ("In order to show that the validity of the agreement is 'in issue,' the party opposing arbitration must show a genuine issue of material fact as to the validity of the agreement to arbitrate. The required showing mirrors that required to withstand summary judgment

in a civil suit." (internal citation omitted)).

A court considering whether to enforce an arbitration agreement must first determine, based on the applicable state law pertaining to contract formation, whether the parties agreed to arbitrate. *Stout*, 228 F.3d at 714; *De Angelis v. Icon Entm't Grp. Inc.*, 364 F. Supp. 3d 787, 792 (S.D. Ohio 2019). Whether an arbitration agreement was formed is always a question to be resolved by the court. *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 296 (2010). Assuming the court finds that a contract was actually formed, the party opposing arbitration may also put forth "generally applicable state-law contract defenses" to the validity or enforceability of the contract, including, but not limited to, such defenses as "fraud, forgery, duress, mistake, lack of consideration or mutual obligation, or unconscionability." *Cooper v. MRM Inv. Co.*, 367 F.3d 493, 498 (6th Cir. 2004). The court must address these issues as well, "absent a valid provision specifically committing such disputes to an arbitrator." *Granite Rock Co.*, 561 U.S. at 299.

## B. Discussion

In their Memorandum in Support of Motion to Compel Arbitration, the defendants argue that (1) the arbitration agreements are valid and enforceable and clearly cover the plaintiff's FLSA claims; (2) "Mission Health is a party" to both Agreements; and (3) "even if Mission Health is not a party to the Arbitration Agreement[s], it can nevertheless enforce [them] under either an estoppel or third-party beneficiary theory." (Doc. No. 13, at 6.) The defendants' Memorandum does not directly address Dickson's status or its ability to enforce the Agreements but, by inference, suggests that the same arguments apply to Dickson. In her Response, Green does not contest that she signed the Agreements and thus agreed to arbitrate employment-related disputes with Engage, and she does not refute the defendants' representations regarding the content of those agreements. Rather, she argues that neither Mission Health nor Dickson is a party to the Agreements and that theories of estoppel and third-party beneficiary standing do not apply. In a footnote, she contends

that, even if either theory applies to Mission Health, the defendants do not raise the same arguments with respect to Dickson and thus, "[a]t a minimum, Plaintiff's claims against Dickson cannot be compelled to arbitration." (Doc. No. 18, at 4 n.6.) In their Reply, also in a footnote, the defendants assert that this claim is "untrue," as Dickson is "an agent of Mission Health" and, as such, entitled to "use the agreement to compel arbitration." (Doc. No. 19, at 2 n.2 (quoting *Broaddus v. Rivergate Acquisitions, Inc.*, 2008 U.S. Dist. LEXIS 86737, *5–6 (M.D. Tenn. Oct. 1, 2008)).)

### 1. Mission Health Is a Party to the Arbitration Agreements

Questions concerning the formation, interpretation, and application of arbitration agreements are governed by generally applicable state contract law. *See, e.g.*, *De Angelis*, 364 F. Supp. 3d at 792. Under Tennessee law, a contract is presumed to be governed by the law of the jurisdiction in which it was executed, absent evidence of a contrary intent. *Johnson v. Long John Silver's Rest., Inc.*, 320 F. Supp. 2d 656, 663 n.3 (M.D. Tenn. 2004). The parties here agree that Tennessee contract law governs their dispute.

The "cardinal rule" of contract construction under Tennessee law is that "courts must interpret contracts so as to ascertain and give effect to the intent of the contracting parties consistent with legal principles." *Indiv. Healthcare Specialists, Inc. v. BlueCross BlueShield of Tenn., Inc.*, 566 S.W.3d 671, 688 (Tenn. 2019) (citations omitted). The Tennessee Supreme Court recognizes that "the rules used for contract interpretation 'have for their sole object to do justice between the parties, by enforcing a performance of their agreement according to the sense in which they mutually understood it at the time it was made.'" *Id.* (quoting *McNairy v. Thompson*, 33 Tenn. 141, 149 (1853); other citations omitted). Thus, "[c]ommon sense must be applied to each case, rather than any technical rules of construction." *Id.* (quoting *Barnes v. Black Diamond Coal Co.*, 47 S.W. 498, 499 (Tenn. 1898)). Tennessee cases embrace both "textualist and contextualist principles," generally focusing on the written words of an agreement as "the lodestar of contract

interpretation," while also considering "the situation of the parties, the business to which the contract relates and the subject matter as appears from the words used." *Id.* at 694 (citations omitted).

The plaintiff does not dispute that she signed the two Agreements, nor does she argue that they are unenforceable for any reason.[1] Instead, she argues that she did not agree to arbitrate any disputes with Mission Health and that, because it is not a party to the Agreements, Mission Health has no ability to enforce them. In support of this argument, she asserts that both of the Agreements "explicitly state they are between Ms. Green and ENGAGE" and that "a few scattered references to 'Mission Health'" in the 2018 agreement are insufficient to make Mission Health a party to either Agreement.

In fact, neither the 2018 Agreement nor the 2019 Agreement states that it is between the plaintiff and Engage only. Instead, the Agreements state that, "[a]s further consideration for" her hiring by Engage, the plaintiff agrees to arbitrate "*any and all*" claims "arising out of or relating to" her employment. (Doc. No. 14-1, at 2, 3 (emphasis added).) They do not limit the scope of the term "employment" to employment by Engage. Rather, the Agreements expressly state that Engage and Mission Health (or, in the 2019 Agreement, the "Client," which the plaintiff does not dispute means Mission Health[2]) are the plaintiff's co-employers and that the plaintiff's

---

[1] The plaintiff purports to reserve the right to contest the "validity of any agreement allegedly entered into between" her and Engage. (Doc. No. 18, at 2 n.5.) Because the court finds that arbitration must be compelled, the plaintiff will have to present any such arguments she might have to the arbitrator.

[2] Although the 2019 Agreement does not refer to Mission Health by name, and instead refers to "Client," the plaintiff does not refute Greger's testimony that Mission Health and Engage had entered into a Client Service Agreement pursuant to which Mission Health and Dickson "operate the [Center]" while Engage provides payroll services (Doc. No. 14 ¶ 3) and, therefore, that the "Client" to which the 2019 Agreement refers is, in fact, Mission Health. *Accord Indiv. Healthcare Specialists*, 566 S.W.3d at 694–95 (reiterating that parol evidence, while not

employment by Engage is contingent upon her employment by Mission Health. By signing the 2018 Agreement, the plaintiff expressly acknowledged these requirements and agreed to "abide by the foregoing regarding [her] employment with Mission Health and Engage PEO." (Doc. No. 14-1, at 4.) By signing the 2019 Agreement, she acknowledged her co-employment by both entities and expressly "certifie[d]" her understanding "that the foregoing statement on employment at will status is the sole and entire understanding between me and the Worksite Employer [Mission Health] and me and ENGAGE PEO concerning the duration of my employment and the circumstances under which my employment may be terminated." (Doc. No. 14-1, at 2.)

Based on the plain language of the Agreements, the court concludes that Mission Health is a party to both the 2018 Agreement and the 2019 Agreement[3] and that, by signing those Agreements, the plaintiff agreed to arbitrate any employment-related dispute she might have with Mission Health.

Even if Mission Health were not a party to the Agreements, it likely would qualify as a third-party beneficiary of the contract. To qualify as a third-party beneficiary under Tennessee law, the party seeking third-party beneficiary status must show that:

(1) The parties to the contract have not otherwise agreed;

(2) Recognition of a right to performance in the [third party] is appropriate to effectuate the intention of the parties; and

(3) The terms of the contract or the circumstances surrounding performance indicate that either:

(a) the performance of the promise will satisfy an obligation or discharge a duty owed by the promisee to the beneficiary; or

admissible to vary or contradict the plain terms of a contract, may be used to clarify an ambiguous term).

[3] The parties have not raised any arguments regarding whether the 2019 Agreement supersedes the 2018 Agreement or whether both remain in effect.

(b) the promisee intends to give the beneficiary the benefit of the promised performance.

*Wallis v. Brainerd Baptist Church*, 509 S.W.3d 886, 899 (Tenn. 2016); *Owner–Operator Indep. Drivers Ass'n v. Concord EFS, Inc.*, 59 S.W.3d 63, 70 (Tenn. 2001). Here, the contract does not disclaim an intent to benefit others, so the parties to it did not "otherwise agree." Recognition of Mission Health's right to enforce the arbitration agreement is appropriate to effectuate the clear intention of the parties as reflected by the scope of the arbitration provision, which is that all disputes related to the joint employment of the plaintiff by Engage and Mission Health be resolved through arbitration; and part of the consideration for the plaintiff's joint employment by Engage and Mission Health is her agreement to submit such disputes to arbitration. Thus, Mission Health would likely be entitled to enforce the Agreements on this basis as well.

### 2.    The Plaintiff Is Estopped from Avoiding Arbitration with Dickson

The question of whether Dickson has the ability to compel the plaintiff to arbitrate her claims against it is less straightforward. First, however, it is clear that Dickson is neither a party to the Agreements nor a third-party beneficiary thereof. It is not referenced, even inferentially, in either agreement, and there is no suggestion that the parties intended to benefit Dickson by entering into the Agreements. The defendants argue that Dickson is Mission Health's "agent" and, as such, is entitled to enforce the Agreements, but they offer no factual or legal support for that assertion. The mere fact that Dickson may be a subsidiary of Mission Health, as the plaintiff alleges, would not make it Mission Health's agent or alter ego. *Accord Gordon v. Greenview Hosp., Inc.*, 300 S.W.3d 635, 651–52 (Tenn. 2009) (noting that, under Tennessee law, "[p]arent and subsidiary corporations are presumed to be separate and distinct legal entities" and that Tennessee courts will not disregard the presumption of corporate separateness, absent "evidence of the parent

corporation's domination of the day-to-day business decisions of the subsidiary corporation").[4]

The operative question, then, is whether the plaintiff's allegations provide a basis for applying a version of the doctrine of equitable estoppel. The plaintiff herself alleges that Dickson and Mission Health jointly employed her and the other similarly situated CNAs. Without distinguishing or differentiating between them in any way, the plaintiff alleges that the defendants, together, were responsible for maintaining a centralized time-keeping system and that they adopted and implemented a common plan that resulted in the FLSA violations alleged in the Complaint. She expressly asserts that the defendants constitute an "integrated enterprise" and perform their business activities through "uniformed operations of common control . . . for a common business purpose." (Doc. No. 1 ¶ 8.) The defendants argue that, under these circumstances, the plaintiff may be compelled to arbitration by a non-signatory to the arbitration agreement.[5]

Tennessee has not expressly adopted or applied equitable estoppel in this context.[6] In *Blue*

---

[4] The defendants' Corporate Disclosure Statements suggest that the defendants are not actually even in a parent-subsidiary relationship but are, instead, something akin to co-subsidiaries. Mission Health identifies non-party Windward Health Partners LLC as a corporate parent, while Dickson identifies Windward Health Partners LLC and non-party GBD, LLC as its parent corporations. (Doc. Nos. 10, 11.)

[5] The court notes that the use of the term "signatory" in this context is somewhat misleading, because the plaintiff, technically, is the only party that signed either contract. Because the written agreements clearly constitute an offer to contract presented to the plaintiff jointly by Engage and Mission Health, and the plaintiff's signature on the documents signaled her acceptance of the offer, the fact that no representatives from either Engage or Mission signed the agreements is irrelevant. *See Staubach Retail Servs.-Se., LLC v. H.G. Hill Realty Co.*, 160 S.W.3d 521, 524 (Tenn. 2005) ("[A] written contract is not required to be signed to be binding on the parties."). What matters is assent. *See id.* at 525 ("Although Staubach did not sign the brokerage agreement, its assent to the agreement is demonstrated by its action to enforce the agreement."). The plaintiff does not argue otherwise. Courts appear to use the terms signatory and non-signatory as proxies for "party" and "non-party." Here, the court employs the term "signatory" to mean "party" and the term "non-signatory" to mean "non-party."

[6] The defendants cite *Mid-South Maintenance, Inc. v. PayChex, Inc.*, No. W2014-02329-COA-R3-CV, 2015 WL 4880855 (Tenn. Ct. App. Aug. 14, 2015), as supporting its equitable estoppel theory, but that case expressly applied New York law. *Id.* at *6.

*Water Bay at Center Hill, LLC v. Hasty*, No. M2016-02382-COA-R3-CV, 2017 WL 5665410, at *9 (Tenn. Ct. App. Nov. 27, 2017), the Tennessee Court of Appeals recognized as much. In that case, the court was called upon to "consider whether a theory of estoppel based on the 'intertwinement' of claims is valid as a matter of Tennessee law." *Id.* To reach a decision on that issue, the court paused to acknowledge and explain several of the estoppel theories that courts have used to enforce arbitration agreements, either by signatories against non-signatories or by non-signatories against signatories. While not attempting to present an "exhaustive account" of the myriad ways in which courts around the country have applied estoppel, the court recognized that non-signatories, specifically, have typically been permitted to compel arbitration in "one of two scenarios," *id.*, which the court described as follows:

> First, estoppel is said to apply when the signatory must "rely" on the terms of an agreement containing an arbitration provision to assert its claims against a nonsignatory. It should be noted that "reliance" on an agreement is not always strictly limited to instances in which a signatory attempts to sue a nonsignatory for breach of contract or derive a nonsignatory's legal duties from the agreement. [Rather], [m]any courts have found that equitable estoppel requires arbitration of non-contract claims so long as the claims refer to the contract, are intertwined with the contract, or presume the contract's existence. *The second scenario in which estoppel is said to apply against a signatory is when a signatory raises allegations of concerted misconduct by both the nonsignatory and one or more signatories to the contract.*

*Id.* (internal quotation marks and citations omitted; emphasis added). In *Blue Water Bay*, the court was only concerned with the first of the two scenarios, "often denominated as an 'intertwined-claims test.'" *Id.* The second, however, is the scenario presented by the case confronting this court.

Regarding the first, the intertwined-claims test, the court viewed with some skepticism the overly broad manner in which some courts have applied it:

> According to one scholar, "[a]lthough courts purport to apply general contract law when interpreting arbitration clauses, they have in fact distorted contract law by creating special rules for arbitration clauses that make them enforceable in situations where other contracts are not." As further explained below, we generally agree with this concern because we disapprove of the extent to which the

"intertwined-claims test" theory of estoppel has been liberally expanded by some courts.

*Id.* at *10 (quoting Richard Frankel, *The Arbitration Clause as Super Contract*, 91 Wash. U. L. Rev. 531, 533 (2014)). Specifically, the court disagreed with those jurisdictions finding that "estoppel is proper merely because a signatory's claim 'references' or factually 'presumes the existence of' the contract containing the arbitration provision." *Id.* The court reached that determination based on its conclusion that

> a "but-for" factual relationship is not sufficient to warrant the application of an estoppel argument. We . . . have concerns that a mere factual intertwinement presents a tenuous legal springboard for declaring that a signatory should be estopped from denying the absence of an agreement with a nonsignatory. . . . [T]he legislative preference for arbitration is intended to erase the traditional judicial antagonism for arbitration, not force parties into arbitration who are not otherwise subject to an arbitration agreement under ordinary contract principles.

*Id.* at *13 (internal quotation marks and citations omitted)).

The Tennessee courts, to date, still have not addressed the "second scenario" recognized in *Blue Water Bay*: the one, as here, in which a "signatory raises allegations of concerted misconduct by both the nonsignatory and one or more signatories to the contract." *Id.* at *9. However, other courts around the country have almost uniformly concluded that the plaintiff in this situation, particularly when the plaintiff alleges joint employment, is estopped from avoiding arbitration with the non-signatory. *See, e.g.*, *Ragone v. Atl. Video at Manhattan Ctr.*, 595 F.3d 115 (2d Cir. 2010) (estopping signatory plaintiff from objecting to arbitration with both signatory employer and non-signatory joint employer); *Holts v. TNT Cable Contractors, Inc.*, No. CV 19-13546, 2020 WL 1046337, at *4 (E.D. La. Mar. 4, 2020) ("Holts and Udeo are the only signatories to the Contractor Arbitration Agreement; TNT is a non-signatory. Nevertheless, TNT seeks to compel arbitration of Holts' FLSA claims because of the intertwined, indeed identical, nature of the claims. Because Holts fails to distinguish Udeo's and TNT's alleged wrongdoing in his complaint, and specifically

alleges that they jointly employed him and jointly failed to pay him overtime, TNT submits that Holts should be compelled to arbitrate his claims against TNT along with his claims against Udeo under the doctrine of equitable estoppel. The Court agrees."); *Townsend v. StandUp Mgmt. Inc.*, No. 1:18CV2884, 2019 WL 3729266, at *9 (N.D. Ohio Aug. 8, 2019) (where the plaintiffs asserted claims under the FLSA based on a joint employer theory, and each plaintiff had a signed arbitration agreement with at least one defendant, finding, "[b]ased on Plaintiffs' numerous allegations of joint misconduct by all named Defendants," that the plaintiffs were "equitably estopped from avoiding arbitration when they have asserted Defendants engaged in substantially interconnected and concerted misconduct"); *Dennis v. United Van Lines, LLC*, No. 4:17CV1614 RLW, 2017 WL 5054709, at * 4 (E.D. Mo. Nov. 1, 2017) ("Plaintiff cannot claim that United and Holman are his employers responsible for FLSA . . . violations yet deny United the right to invoke the arbitration clause. . . . Thus, the Court finds that equitable estoppel applies, and Defendant can compel arbitration . . . .").

The court has found that the plaintiff agreed to arbitrate her employment related claims against Mission Health. The plaintiff alleges that Mission Health and Dickson jointly employed her and jointly violated her rights under the FLSA, but that Dickson, specifically, cannot compel her to arbitrate because it is not a party to the arbitration agreements. The court believes that the Tennessee Supreme Court, despite its skepticism of a broadly applied "intertwinement test" for extending the estoppel doctrine, would nonetheless conclude that a plaintiff in the "second scenario" is estopped from avoiding arbitration, particularly when, as here, the plaintiff alleges that the defendants are her joint employers and jointly engaged in the alleged wrongdoing.

Accordingly, this court finds that the plaintiff is equitably estopped from avoiding arbitration with non-signatory Dickson.

### 3.    *Whether to Stay or Dismiss*

The defendants expressly move the court to compel arbitration and dismiss the Complaint without prejudice. (Doc. No. 12, at 1; Doc. No. 13, at 1.) The plaintiff's Response does not address the question of whether, if arbitration is required, the case should be stayed or dismissed. Because the plaintiff has not requested a stay of this matter pending final resolution by the arbitrator, and because all of her claims will be referred to arbitration, this matter will be dismissed without prejudice. *See Hilton v. Midland Funding, LLC*, 687 F. App'x 515, 518 (6th Cir. 2017) (affirming district court's dismissal without prejudice, because "[t]he FAA requires a court to stay proceedings pending arbitration only 'on application of one of the parties.'" (citation omitted)); *Ozormoor v. T-Mobile USA, Inc.*, 354 F. App'x 972, 975 (6th Cir. 2009) (affirming order compelling arbitration and dismissing the complaint because, although § 3 of the FAA requires a stay of proceedings when a separate claim is referable to arbitration, it does not require a stay when all the claims will be arbitrated).

## III.    MOTION TO DISMISS

The court notes that the Motion to Dismiss improperly relies upon matters outside the pleadings and is addressed to the question of whether the plaintiff can prove her claims rather than to the question of whether she states colorable claims. Regardless, because the parties must be compelled to arbitration, the court will deny as moot the defendants' alternative request that the case be dismissed for failure to state a claim for which relief may be granted.

**IV.** **CONCLUSION**

For the reasons set forth herein, the court will grant in part and deny in part the pending motion. Specifically, that portion of the motion seeking an order compelling arbitration and dismissing the case without prejudice will be granted, and that portion of the motion seeking dismissal of the case with prejudice under Rule 12(b)(6) will be denied as moot.

And appropriate Order is filed herewith.

_____
ALETA A. TRAUGER
United States District Judge